# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| **MINNESOTA LAWYERS MUT. INS. CO.,** | * | |
| **Plaintiff** | * | |
| **v.** | * | **CIVIL NO.  JKB-10-2701** |
| **BAYLOR & JACKSON, PLLC,** | * | |
| **Defendants** | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM</u>

Plaintiff Minnesota Lawyers Mutual Insurance Company ("MLM") filed suit seeking a declaratory judgment that it is not liable to Defendants under a professional liability insurance policy for defense and indemnification in a legal malpractice case.  (Compl., ECF No. 1.)  The primary Defendant is the law firm, Baylor & Jackson, PLLC; the other Defendants include the two principals at Baylor & Jackson and the firm's clients who sued the firm for malpractice. They will be collectively referred to in this opinion as either Baylor & Jackson or Defendants. Defendants counterclaimed, asking for a declaratory judgment that MLM was liable under the policy.  (ECF No. 18.)  Pending before the Court are cross-motions for summary judgment, which have been thoroughly briefed.  (ECF Nos. 35, 37, 38, 39.)  No hearing is necessary.  Local Rule 105.6 (D. Md. 2011).  Plaintiff's motion will be granted and Defendants' motion will be denied.

## *I.  Undisputed Facts*

The parties agree that this case presents no genuine dispute of material fact.  The facts focus on three separate but intertwined litigation matters prior to this one, and the facts pertaining to the first two litigation matters are primarily drawn from the summary judgment

opinion of Judge Joseph H.H. Kaplan and the docket of the Baltimore City Circuit Court in the second case.  (Pl.'s Mot. Summ. J., Ex. 5 & 9, ECF No. 35.)

In the first case, Henry Thomas ("Thomas")  and Richard Thomas, owners and operators of several companies (collectively, the "Underlying Defendants"), filed claims in 1999 against the United States Government, claiming the Government had breached its contracts with the Underlying Defendants for provision of materials and services to the Government.   The Underlying Defendants ultimately prevailed and recovered approximately $5 million.  But the Underlying Defendants apparently needed financial assistance in order to move forward with the lawsuit.  To that end, Thomas requested his then-friend William Robbins to provide funding for the litigation.  Thomas and Robbins then entered into a series of agreements for that purpose.

On July 22, 1998, they entered into a letter agreement (the "3:1 Agreement") by which Thomas agreed to repay Robbins $75,000 for every $25,000 supplied by Robbins as personal expense money for Thomas, providing the Government claims litigation was successful.   On December 16, 1998, they executed another agreement in which Robbins agreed to finance the cost of litigating the Government claims.   On November 11, 1999, they entered into a Cooperation Agreement, in which Robbins agreed to pay the legal fees and costs of litigating and/or settling the Government claims.   In return, Robbins was to receive one sixth of the first $21 million in any judgment obtained against the Government.  Robbins was the first in line to receive payment under the Cooperation Agreement.

On May 1, 2001, the parties executed the Private Legal Side Agreement, in which Robbins agreed to a 50% discount on Thomas's repayment of attorneys' fees, as long as Thomas first furnished Robbins with an accounting showing Thomas had repaid all of the out-of-pocket expenses incurred by Robbins.   On May 20, 2002, Thomas and Robbins entered into another agreement (the "May 2002 Contract") in which Thomas agreed to pay Robbins $600,000 as a

consulting fee in consideration for Robbins's "time and discussions" he had spent with Thomas in the preceding eighteen years in connection with the Government claims and the several companies owned and operated by Thomas and Richard Thomas.  Finally, the last agreement was entered into by Robbins and Brian Freck, not a party to the instant case; to fulfill this agreement, Thomas opened a bank account at the Community National Savings Bank in Mount Vernon, New York, to serve as the deposit account for the judgment on the Government claims. The agreement's payment instructions were the same as those found in the Cooperation Agreement such that Robbins was first in line to be paid.[1]

From December 16, 1998, to February 20, 2004, Thomas retained six different attorneys to handle the Government claims litigation.  During that same time, Robbins spent nearly $1 million in legal fees for the litigation.  In February of 2004, Thomas's accountant, Steven Landau, prepared a report including an itemized list of Robbins's expenditures and the amount owed to Robbins, which Landau calculated to be $1,844,504.  Landau's report erroneously made certain deductions, amounting to almost $200,000, not allowed under the Cooperation Agreement and did not mention the $600,000 consulting fee owed to Robbins.  Robbins objected to the figures and in February of 2004 retained an attorney to represent him.  Thomas then asserted that Robbins had not performed under the agreement to provide funding for the Government claims litigation.  On April 21, 2004, Thomas alleged Robbins had failed to advance certain attorneys' fees during the 1998 to 2004 period; consistent with this accusation of breach, Thomas alleged Robbins was only entitled to receive $1,529,397.

Robbins responded in July 2005 with a four-count complaint in Baltimore City Circuit Court against Thomas, Freck, and other Underlying Defendants, alleging breach of the

---

[1]  It is not clear from Judge Kaplan's opinion why Thomas was the one to open the account if the agreement was between Robbins and Freck.  It is, however, unnecessary to resolve this ambiguity in order to reach a decision in the case before this Court.

Cooperation Agreement (Count I), entitlement to declaratory judgment (Count II), breach of fiduciary duty (Count III), and breach of the 3:1 Agreement (Count IV).  In November 2005, Robbins also sued Thomas for breach of the May 2002 Contract concerning the $600,000 consulting fee.  In January 2006, the two cases were consolidated.

On March 20, 2006, the Underlying Defendants' attorney, Mr. Charles M. Kerr, terminated his appearance and Ms. Brynee K. Baylor of Baylor & Jackson entered her appearance on behalf of the Underlying Defendants in Robbins's cases.  In May or June 2006, Ms. Dawn Jackson of Baylor & Jackson was admitted *pro hac vice* on behalf of the Underlying Defendants.  On July 27, 2006, Robbins filed a motion for summary judgment on his original claims for breach of the Cooperation Agreement, breach of the 3:1 Agreement, and breach of fiduciary duty as well as his consolidated claim for breach of the May 2002 Contract.  The Underlying Defendants filed their opposition to the motion on August 11, 2006, and Robbins's reply was filed August 17, 2006, the same day Judge Kaplan held a hearing on the motion.

He granted summary judgment on August 22, 2006, for Robbins on the Cooperation Agreement in the amount of $1,844,913, which consisted of $835,777 for Robbins's one-sixth share of the final judgment amount, $933,874 for attorneys' fees, and $75,262 in reimbursement for the amount in excess of $125,000 that Robbins advanced for Thomas's personal expenses. He also granted summary judgment for Robbins on the 3:1 Agreement in the amount of $199,955.  Judge Kaplan further granted summary judgment for Robbins on the claim of breach of fiduciary duty, but awarded only attorney's fees for Robbins's pursuit of the claim (the attorney's fees on this count were reversed on appeal).  Finally, the judge granted summary judgment to Robbins on his consolidated claim for $600,000 under the May 2002 Contract.

Regarding the Cooperation Agreement, Judge Kaplan noted that the Underlying Defendants did not contest its validity in either their original answer or their amended answer,

the latter of which was filed, this Court notes, in May 2006, after Baylor & Jackson entered the case.  Because they failed to contest the Cooperation Agreement's validity, they were deemed to have admitted it.  Thomas tried to contest the validity of the agreement in his opposition to summary judgment on the basis it was not signed by the original designated fund manager, but he failed to submit either an affidavit or a sworn statement to support his contention, and the judge disregarded his argument.[2]  Judge Kaplan also found that the parties had entered into a "Confirmation Agreement" that expressly affirmed the validity of the Cooperation Agreement, but it is unclear from his opinion which of the various agreements following the Cooperation Agreement is considered to be the Confirmation Agreement.[3]  The judge further relied upon the February 2004 Landau report and a "letter of representations" from Thomas as proof that Robbins was not in breach of his contractual obligations under the Cooperation Agreement, but again, it is not clear to which document the judge was referring as the "letter of representations." Although Thomas contested the 2004 Landau report as only a draft report, the judge found Thomas had made only "irrelevant cosmetic changes" to it before the word "draft" was removed

---

[2]  In later correspondence between counsel for MLM and Baylor & Jackson regarding insurance coverage for the malpractice case, MLM's counsel noted the following:

> Baylor & Jackson filed a timely opposition to the motion for summary judgment which argued, at least in part, that summary judgment could not be granted as a matter of law because genuine disputes of material fact existed.  In an attempt to present those material facts to the court, Baylor & Jackson attached an affidavit from Mr. Thomas.  However, the affidavit was unexecuted and had been attached in that form in error.  At the hearing on August 17, 2006, the Honorable Joseph H.H. Kaplan refused to either allow Mr. Thomas to execute the affidavit or testify to the contents of the affidavit despite Mr. Thomas' presence at the hearing.

(Defs.' Opp., Ex. 8, Farquharson Letter, 9/17/2010.)

[3]  A copy of a Confirmation Agreement dated September 30, 2003, is included in MLM's exhibits to its motion in this Court as exhibit number 2 that was attached to the complaint filed by Robbins against Thomas.  (Pl.'s Mot. Summ. J., Ex. 2, Compl., Case No. 24-C-05-006855, Baltimore City Circuit Court, ex. 2.)  This is presumed to be the agreement to which Judge Kaplan referred.

by Landau.  Furthermore, he found the 2006 version propounded by Thomas—showing Robbins owed Thomas $18,635—was not based upon Landau's independent investigation but only upon what Thomas had told Landau.  Consequently, relying upon Landau's testimony, the judge accepted the February 2004 report as the final version and disregarded the 2006 report.

Thomas had also argued the Private Legal Side Agreement precluded Robbins from recovering the attorneys' fees he had paid from 1998 to 2004, but Judge Kaplan found the agreement had a condition precedent that Thomas had to satisfy before he could claim the benefit of the 50% discount on repayment of attorneys' fees and further found Thomas had not fulfilled the condition precedent, i.e., an accounting showing Thomas had repaid all of Robbins's out-of-pocket expenses.  Thomas's attempt to treat the 2006 Landau report as the final accounting was denied, in keeping with the judge's earlier pronouncements that the 2004 Landau report was to be treated as the final report and that the 2006 Landau report was based only on what Thomas had told Landau rather than upon Landau's independent investigation of the facts.

As a result, the judge found no genuine dispute as to any material fact on the enforceability of the Cooperation Agreement and rendered judgment for Robbins on that count as a matter of law.  Notably, the judge said,

> Although Thomas disputes various items in his Response, this Court cannot accept them as facts.  Documents, affidavits, and sworn testimony in the record contradict the assertions made in Thomas's Response.

(Pl.'s Mot. Summ. J., Ex. 5 at 8.)  In closing his discussion of the Cooperation Agreement, Judge Kaplan also observed Robbins had correctly argued that Thomas had waived his right to claim that Robbins had failed to advance certain legal fees because Thomas had continued to accept Robbins's performance for years following his supposed breach and was, therefore, estopped from asserting Robbins's breach as a defense to enforcement of the Cooperation Agreement.

Regarding the 3:1 Agreement, Judge Kaplan reaffirmed his earlier finding that the 2004 Landau Report was the proper final accounting for Thomas's personal expenses and Robbins's expenditures therefor and, accordingly, granted summary judgment for Robbins.  On this point, he also reaffirmed his earlier disregard of the 2006 Landau report.

Finally, the judge found the May 2002 Contract was valid and enforceable.  He rejected Thomas's argument the contract was either an unconscionable contract or an adhesion contract in light of the evidence it was written by Thomas himself in his own handwriting.  Judge Kaplan also rejected Thomas's allegations of duress, noting they were "unsupported by evidence or any other tangible proof," and further stating he was "thoroughly unprepared to blindly accept such an allegation on a 'take my word for it' basis."  (*Id.* at 11.)  The judge concluded his discussion on this count by finding the contract was supported by adequate consideration.  Consequently, Thomas was found liable for $600,000 under the May 2002 Contract.

The total damages awarded to Robbins on all counts amounted to $2,644,868.  This damage award was affirmed on appeal by the Court of Special Appeals of Maryland.  *Thomas v. Robbins*, No. 944, September Term, 2008 (Md. Ct. Spec. App. July 8, 2009) (unreported) (Exhibit 10 to MLM's motion for summary judgment).  The appellate issue relevant to the instant lawsuit was whether the trial court erred by granting summary judgment on the four substantive counts:  breach of the Cooperation Agreement, breach of fiduciary duty, breach of the 3:1 Agreement, and breach of the May 2002 Contract.[4]  The court observed that the Underlying Defendants' opposition to summary judgment "was not supported by affidavits, deposition testimony, interrogatory answers, or any sworn evidence as required by Maryland Rule 2-501."  *Id.*, slip op. at 7.

---

[4]  The Court of Special Appeals noted the trial court's resolution of the count for declaratory relief subsequent to Judge Kaplan's resolution of Robbins's motion for summary judgment did not affect the appeal, *id.*, slip op. at 1 n.1; similarly, it has no effect on the instant case.

It stated the standard for summary judgment, in part:

> "[O]nce the moving party has provided the court with sufficient grounds for summary judgment, the non-moving party must produce sufficient evidence to the trial court that a genuine dispute as to a material fact exists."  [*Arroyo v. Bd. of Educ. of Howard County*, 381 Md. 646, 654 (2004).]   "This requires producing facts under oath, based on the personal knowledge of the affiant to defeat the motion."  *Id.*  Moreover, those sworn statements must "set forth such facts as would be admissible in evidence."  Md. Rule 2-501(c).   "Bald, unsupported statements or conclusions of law are insufficient."  *Id.*

*Id.* at 10.

Applying that standard to the case before it, the court rejected the Underlying Defendants' argument that the trial court erred in granting Robbins summary judgment because several material facts were in dispute.  *Id.* at 11.  The court found the Underlying Defendants' failure to support their opposition with sworn statements "was a proper ground upon which the trial court could conclude that no dispute of material fact existed."  *Id.*  Given the Underlying Defendants' appellate concession that, if the facts as alleged by Robbins were true then those facts would justify judgment as a matter of law in his favor on the Cooperation Agreement, the court found no reason to address this count any further, thus affirming the trial court.  *Id.*

In addressing the remaining counts, the court stated:

> In granting summary judgment on Counts III [breach of fiduciary duty] and IV [breach of 3:1 Agreement] and the Consolidated Count [breach of May 2002 Contract], the trial court did not expressly restate its determination that appellants had failed to place disputed material facts before the court by way of sworn evidence.  Normally, we "are confined to the basis relied upon by that court and may not otherwise explain its conclusion by introducing new legal theories."  It is evident, however, that appellants' failure to comply with Maryland Rule 2-501 severely undermined their opposition to summary judgment on all the counts.[6]  Consequently, we shall conduct our analysis of whether appellee was entitled to judgment as a matter of law on the basis of the facts as alleged in appellee's motion for summary judgment.
>
>> Footnote 6:   Indeed, counsel for appellants conceded that appellants' opposition was not adequately supported by sworn statements.

*Id.* at 11-12 (citation omitted).

The court then affirmed the grant of summary judgment as to breach of fiduciary duty, "[a]part from argument regarding alleged material facts in dispute," because the court also affirmed the factual findings of the trial court on the existence of a fiduciary relationship between Thomas and Robbins and Thomas's acts contrary to that relationship. *Id.* at 12-13. As noted earlier, however, the award of attorney's fees on this count was reversed on appeal. Next, the Underlying Defendants' breach of the 3:1 Agreement was affirmed because the only argument on appeal, besides that of whether summary judgment was proper, had not been preserved for appellate review. As for the consolidated count, the trial court's grant of summary judgment with respect to the May 2002 Contract was affirmed: "Viewing the facts as alleged in appellee's motion for summary judgment (as a result of appellants' failure to oppose adequately those alleged facts), we conclude that the trial court did not err as a matter of law in granting appellee summary judgment on the consolidated count." *Id.* at 15.

Turning now to the Underlying Defendants' malpractice suit against Baylor & Jackson, the Court draws the facts from the parties' submissions to this Court. Ms. Baylor's affidavit states that she contacted MLM as soon as she received the appellate court's opinion on July 9, 2009, by calling MLM and reporting the possibility of a claim against her firm. (Defs.' Opp., Ex. 1, Baylor Aff. ¶¶ 8, 9, ECF No. 36.) Before then, MLM had not received a report from Baylor & Jackson of a potential claim. (Pl.'s Mot. Summ. J., Ex. 6, Lore Aff. ¶ 3.) On August 11, 2009, the Underlying Defendants brought a malpractice suit against Baylor & Jackson, its two principals, and the other attorneys who represented the Underlying Defendants against Robbins before Baylor & Jackson entered its appearance; the suit sought more than $7,000,000 in damages. (Pl.'s Mot. Summ. J., Ex. 1, Compl., *Thomas v. Baylor*, Case No. 24-C-09-005000, Baltimore City Circuit Court.) MLM defended Baylor & Jackson from the time the malpractice action was filed until October 1, 2010. (Baylor Aff. ¶ 12.)

On September 17, 2010, counsel for MLM (who also represents MLM in the instant suit) wrote Ms. Baylor and Ms. Jackson and advised them MLM was ceasing its representation of them as of October 1, 2010, and would not pay any settlement or judgment because it disclaimed coverage.  (Defs.' Mot. Summ. J., Ex. 8, Farquharson Letter, 9/17/2010.)  The reason given was that an internal review revealed Baylor & Jackson's claim should have been reported to MLM during the policy period of August 1, 2006, to August 1, 2007, because it was during that time that the firm "first became aware of facts which could have reasonably supported the claim asserted against it by Mr. Thomas." (*Id.*)  When MLM disclaimed coverage, mediation in the malpractice case had been scheduled for October 11, 2010, with trial scheduled to begin December 6, 2010.  (Baylor Aff. ¶ 14.)  At the scheduled mediation, Baylor & Jackson and the Underlying Defendants agreed to settle the case for $850,000.

## II.  Standard for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)).  The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment.  *Id.* at 252.  The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir.

2008), who may not rest upon the mere allegations or denials of his pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial, Fed. R. Civ. P. 56(c)(1).   Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit.   Rule 56(c)(4).

### III.  Applicable Insurance Policy

The parties are diametrically opposed to one another on the issue of which insurance policy governs this case.   MLM contends it is the 2006 Policy while Baylor & Jackson expressly disclaims any reliance on the 2006 Policy, asserting instead that the 2009 Policy governs.   (*See* Pl.'s Supp. Mem. 9, ECF No. 35; Defs.' Opp. 13; Pl.'s Reply, Ex. 12, Baylor & Jackson's Ans. Interrog. No. 19, ECF No. 38.)   The two policies have identical wording; the only difference is the terms for which they were in force.   The 2006 Policy was in effect from August 1, 2006, to August 1, 2007.   The 2009 Policy was in effect from August 1, 2008, to August 1, 2009.[5]   The policy is a claims-made policy with the following statement of coverage:

> WE will pay all sums up to the limit of OUR liability, which the INSURED may be legally obligated to pay as DAMAGES due to any CLAIM:
> (1) arising out of any act, error or omission of the INSURED or a person for whose acts the INSURED is legally responsible; and
> (2) resulting from the rendering or failing to render PROFESSIONAL SERVICES while engaged in the private practice of law or from rendering or failing to render PROFESSIONAL SERVICES as a PART TIME EMPLOYED ATTORNEY OF A GOVERNMENTAL BODY, SUBDIVISION OR AGENCY.

(Pl.'s Mot. Summ. J., Ex. 7.)   The claims-made provisions are as follows:

> A CLAIM is covered only if made during the POLICY PERIOD or extended reporting period and reported to US:
> (1) during the POLICY PERIOD;

---

[5]  Although it is confusing to the Court for the parties to use the beginning year for the 2006 Policy and the ending year for the 2009 Policy, the Court nevertheless maintains the nomenclature used by the parties in the analysis of the case.

> (2) within 60 days after the end of the POLICY PERIOD; or
> (3) during the extended reporting period.
> The act, error or omission giving rise to the CLAIM must have occurred:
>> (1) during the POLICY PERIOD; or
>> (2) prior to the POLICY PERIOD and on or after the PRIOR ACTS RETROACTIVE DATE, if the INSURED had no knowledge of facts which could reasonably support a claim at the effective date of this policy.
>
> A CLAIM is deemed made when:
>> (1) a demand is communicated to the INSURED for DAMAGES or PROFESSIONAL SERVICES;
>> (2) a lawsuit is served upon the INSURED seeking DAMAGES; or
>> (3) an act, error or omission by any INSURED occurs which has not resulted in a demand for DAMAGES but which an INSURED knows or reasonably should know, would support such a demand.
> We will not provide coverage for any CLAIM arising out of the same, related or continuing PROFESSIONAL SERVICES which resulted in a CLAIM prior to the first policy issued to the INSURED by US.

*Id.*  The policy also provided the following definitions:

> "CLAIM(S)" means:
>> (1) A demand communicated to the INSURED for DAMAGES or PROFESSIONAL SERVICES;
>> (2) A lawsuit served upon the INSURED seeking DAMAGES; or
>> (3) An act, error or omission by any INSURED which has not resulted in a demand for DAMAGES but which an INSURED knows or reasonably should know, would support such a demand.
>
> . . .
>
> "POLICY PERIOD" means the period from the effective date of this policy to the expiration date or earlier termination date of this policy.  POLICY PERIOD does not include any extended reporting period.

*Id.*

Given the policy's definition of coverage, the act, error, or omission giving rise to the Underlying Defendants' malpractice claim occurred on August 11, 2006, when Baylor & Jackson filed the opposition to summary judgment without supporting evidence.  This date fell within the one-year term of the 2006 Policy.  If a claim could be deemed to have been made during the 2006 Policy's term, then it would have been covered as long as it was reported to MLM during the time period incorporated in the policy's definition of coverage.  The policy sets

forth three ways in which a claim is deemed to be made, but the first two do not apply because, clearly, neither a demand for damages was communicated to Baylor & Jackson nor was a lawsuit served upon the firm during the 2006 Policy's term. The remaining way to define when a claim is deemed made is, "an act, error or omission by any INSURED occurs which has not resulted in a demand for DAMAGES but which an INSURED knows or reasonably should know, would support such a demand." Baylor & Jackson implausibly argues that, even though the malpractice occurred in 2006, the firm and its principals were unaware that any conduct by them could reasonably be considered as a potential basis for a malpractice claim until they received the appeals court's opinion on July 9, 2009. (Defs.' Opp. 17, 19.)

The parties agree that Maryland employs an objective standard for evaluating the reasonableness of an insured's actions in relation to the obligation to notify an insurance company of a potential claim. *See Commercial Union Ins. Co. v. Porter Hayden Co.*, 698 A.2d 1167, 1194 (Md. Ct. Spec. App. 1997). Thus, "an insured's notice obligation accrues when the circumstances known to the insured at that time would have suggested to a reasonable person the possibility of a claim." *Id.*

Any reasonable lawyer admitted to practice in Maryland and engaged in civil practice in Maryland should be knowledgeable of the Maryland standard for summary judgment motions and oppositions, which is for all intents and purposes identical to the federal standard. As is pertinent to the opposition to a motion for summary judgment, Maryland Rule 2-501(b) requires the following:

> A response to a written motion for summary judgment shall be in writing and shall (1) identify with particularity each material fact as to which it is contended that there is a genuine dispute and (2) as to each such fact, identify and attach the relevant portion of the specific document, discovery response, transcript of testimony (by page and line), or other statement under oath that demonstrates the dispute. A response asserting the existence of a material fact or controverting any fact contained in the record shall be supported by an affidavit or other written statement under oath.

In addition, Maryland Rule 2-501(c) speaks to the form of an affidavit:

> An affidavit supporting or opposing a motion for summary judgment shall be made upon personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated in the affidavit.

*See also Beatty v. Trailmaster Products, Inc.*, 625 A.2d 1005, 1010-12 (Md. 1993) (general statement of standard for summary judgment).

Thus, any reasonable lawyer faced with a motion for summary judgment could simply have read Maryland Rule 2-501 and known that an unexecuted affidavit does not satisfy the Maryland standard for summary-judgment practice. Baylor & Jackson reasonably could have become aware, probably acutely aware, of that during the motions hearing when Judge Kaplan refused to let Thomas either execute the affidavit or provide testimony at the hearing. (*See* note 2, *supra*.) It certainly should have become aware of its shortcoming when Judge Kaplan rendered his opinion on August 22, 2006, specifically pointing out the absence of admissible evidence from the opposition that could possibly establish a genuine dispute of material fact. Any reasonable lawyer would have read Judge Kaplan's opinion with alarm as to what it meant to him or her personally. Any reasonable lawyer would have been worried it could lead to a malpractice claim. At that point, a claim was deemed made under the 2006 Policy. And at that point, Baylor & Jackson had to report the claim during the 2006 Policy term in order for it to be a covered claim. Consequently, Baylor & Jackson's failure to report it during the 2006 Policy term precluded coverage.

Defendants argue that Baylor & Jackson had no reason to give notice to MLM in 2006 because Judge Kaplan's grant of summary judgment was based upon multiple, alternative grounds, "only one of which was the alleged lack of an affidavit." (Defs.' Opp. 15.) Thus, "[i]t would have been clear to any reasonable lawyer that, even if an affidavit had been included, the

Court would have granted summary judgment anyway." (*Id.*)  This argument misses the point. MLM's concern is liability for malpractice, not whether Baylor & Jackson would have lost the case on the merits anyway.  Lawyers regularly lose cases without being sued for malpractice.  It is only because Baylor & Jackson's malpractice provided *a reason* for Baylor & Jackson's clients to lose the case that the disposition of the case matters to MLM.  Any reasonable lawyer would have been aware that Maryland appellate courts may affirm a summary judgment on any one of several, alternative grounds, *see Baltimore Teachers Union, Am. Fed'n of Teachers, Local 340, AFL-CIO v. Mayor & City Council of Baltimore*, 671 A.2d 80, 87-88, 99 (Md. Ct. Spec. App. 1996), and, thus, Baylor & Jackson risked appellate affirmance solely on the basis of the firm's malpractice.  If the malpractice had not occurred, then it is certainly possible Judge Kaplan would have nevertheless granted summary judgment for Robbins, and it is also possible that the Court of Special Appeals would have affirmed on a non-malpractice ground, but in that scenario, malpractice would be taken off the table, liability insurance coverage would not be an issue, and this case would not exist.

To avoid the application of the 2006 Policy to them, Defendants advance the argument that the 2009 Policy applies to their claim.  This fails, in the first place, because of the Court's prior determination of when a claim was deemed to have been made, i.e., in August 2006, but also because of the application of definitional language for "act, error, or omission."  The 2009 Policy (as well as the 2006 Policy) defines "act, error, or omission giving rise to the CLAIM" so that it must have occurred either during the policy term (August 1, 2008, to August 1, 2009) or prior to the policy term and on or after the insured's prior acts retroactive date, "if the INSURED had no knowledge of facts which could reasonably support a CLAIM at the effective date of this policy."  (*Id.*, Ex. 7, policy at 1.)  MLM provided an endorsement for Baylor & Jackson's policy

that set Ms. Baylor's "prior act retroactive date" as August 1, 2003, and Ms. Jackson's as August 1, 2004. (*Id.*, Ex. 7.)

Obviously, the act, error, or omission giving rise to the Thomas malpractice case occurred in August 2006, and Defendants do not argue otherwise. Therefore, the act, error, or omission did not occur during the 2009 Policy's term, and hence, the first method of defining act, error, or omission does not apply. As to the second method, which allows an act, error, or omission occurring prior to the policy term and on or after the insured's prior acts retroactive date, if those were the only definitional criteria, then the August 2006 malpractice would satisfy them. However, they are qualified by the additional language, "if the INSURED had no knowledge of facts which could reasonably support a CLAIM at the effective date of this policy." At the effective date of the 2009 Policy, August 1, 2008, Baylor & Jackson did have knowledge of facts that could reasonably support a claim against the firm for malpractice. It obtained that knowledge in August 2006 when Judge Kaplan denied the firm's request to allow Thomas to execute his affidavit at the motions hearing and, a week later, when he granted summary judgment in an opinion that unequivocally disparaged the opposition's failure to provide evidentiary support for its assertion of disputes of material facts. Thus, by the terms of the 2009 Policy, the act, error, or omission giving rise to the Thomas malpractice claim was excluded from coverage.

Another reason exists for finding the inapplicability of the 2009 Policy. The Court observes the policies include a provision regarding representations made by the insured:

> The application for coverage is a part of this policy.
>
> By acceptance of this policy the INSURED agrees:
> (1) the statements in the application are the representations of all INSUREDS;
> (2) such representations are material as this policy is issued in reliance upon the truth of such representations; and
> (3) this policy embodies all of the agreements between the INSURED, US and/or OUR agent.

(Pl.'s Mot. Summ. J., Ex. 7 at 7.)

In 2007, Ms. Baylor answered "No" to the renewal application's questions, "In the last 12 months[,] a. have any malpractice CLAIMS been made against any member of the firm? [and] b. has any firm member become aware of any INCIDENT which could reasonably result in a claim being made against the firm or a member of the firm?"  (Pl.'s Reply, Ex. 6.)  In 2008, she answered "Yes" to the preceding two questions and further indicated the firm had reported all claims and incidents to MLM.  (*Id.* Ex. 7.)  However, Baylor & Jackson has explicitly stated it did not notify MLM of the Robbins-Thomas incident until July 9, 2009.  Thus, Ms. Baylor's affirmative answers to these questions in 2008 must relate to other matters having no connection to the Robbins-Thomas incident.

Again, because the facts show Baylor & Jackson did have knowledge in 2008 of the Robbins-Thomas incident that could have reasonably resulted in a claim being made against the firm or a member of the firm and because the facts show Baylor & Jackson had not reported it to MLM, its representation otherwise on the renewal application could have been reasonably regarded by MLM as a material misrepresentation.  When Ms. Baylor signed the renewal applications, they included the following statement:  "I understand that failure to report any known claims or potential claims, or other material information may result in the declination of coverage or policy rescission."  (*Id.*, Ex. 6 & 7.)  Consequently, MLM was entitled to decline coverage under the 2009 Policy on the ground of material misrepresentation.  The Court concludes the 2009 Policy has no applicability to this case.

## IV.  *Notice and Prejudice*

As a fallback argument, Defendants contend that, even if the 2006 Policy is the one that applies to this case, MLM must show prejudice flowing from Baylor & Jackson's untimely

notice of the 2006 claim.  This position, of course, is contrary to the firm's explicit disclaimer of any reliance upon the 2006 Policy, and MLM argues, quite reasonably, that Defendants are estopped from relying on the 2006 Policy because they have waived any right to coverage under it.  MLM does not, however, develop its argument with citation to authority, and Defendants do not even address it.  The point remains interesting but not conclusive.

Defendants' argument relies upon interpretation of a Maryland statute that provides as follows:

> An insurer may disclaim coverage on a liability insurance policy on the ground that the insured or a person claiming the benefits of the policy through the insured has breached the policy by failing to cooperate with the insurer or by not giving the insurer required notice only if the insurer establishes by a preponderance of the evidence that the lack of cooperation or notice has resulted in actual prejudice to the insurer.

Md. Code Ann., Ins. § 19-110 (LexisNexis 2011).

On its face, the statute could be applicable here.  But the manner in which it has been interpreted by the Maryland Court of Appeals requires the conclusion it does not apply to this case.

The two cases interpreting this statute in relation to the kind of insurance policy at issue in this case are *T.H.E. Ins. Co. v. P.T.P. Inc.*, 628 A.2d 223 (Md. 1993) (interpreting forerunner to § 19-110), and *Sherwood Brands, Inc. v. Great Am. Ins. Co.*, 13 A.3d 1268 (Md. 2011). *Sherwood Brands* recounted the history of the statute from 1964 when the Maryland Legislature enacted a substantially similar statute in response to the case of *Watson v. United States Fid. & Guar. Co.*, 189 A.2d 625 (1963), which held that an individual who was involved in an automobile accident, and who waited a little over a month to notify the insurer of his claim, could be denied coverage based on late notice without a showing of prejudice to the insurer because the late notice failed to satisfy a condition precedent of the policy.  *Watson*, 189 A.2d at 627, *cited in Sherwood Brands*, 13 A.3d at 1274-75.  In a later case, the court opined that the

statute "appears to have been enacted to remedy the harsh result of the *Watson* case."   *St. Paul Fire & Marine Ins. Co. v. House*, 554 A.2d 404, 416 (1989).

In *T.H.E.*, the court considered the applicability of the statute to an insurer's denial of coverage under a claims-made policy for a claim made and reported after the policy had expired. In an interesting twist, the court adopted the rationale of the dissent authored by Chief Judge Robert C. Murphy in *House*.   628 A.2d at 223.   The comprehensive general liability policy issued by T.H.E. to the insured, P.T.P., who operated a go-kart track in Ocean City, Maryland, had two provisions that figured in the court's decision.   The first specified that the insurance policy only applied to either bodily injury or property damage if a claim based on bodily injury or property damage was first made against P.T.P. during the policy period; it further specified that a claim would be considered to have been made when written notice of the claim was received and recorded by T.H.E.   The second provision obligated the insured to notify T.H.E. as soon as practicable of an occurrence that may result in a claim and further set forth the expected contents of a notice.   *Id.* at 225.

The policy period at issue in *T.H.E.* was from April 2, 1987, to April 2, 1988.[6]   A child was injured at P.T.P.'s track on August 27, 1987, but P.T.P. did not report the occurrence to T.H.E. until June 20, 1988, when P.T.P. received a claim for damages from the child's attorney. *Id.* at 223-24.   This notice was outside of the 60-day basic extended reporting period automatically allowed beyond the policy's expiration date.   T.H.E. responded promptly that it was denying coverage.   The claim led to a lawsuit against P.T.P. that T.H.E. did not defend. P.T.P. sought a declaratory judgment against T.H.E., and the trial court held that T.H.E. was

---

[6]   Although the policy was renewed, the effective date of the renewal policy was May 27, 1988.  The gap in coverage and a related claim P.T.P. had brought against its insurance agent and broker for failing to place proper insurance coverage were to be addressed by the trial court on remand.  628 A.2d at 231 n.9.

obliged under the 1987-88 policy to defend P.T.P. in the personal injury suit because T.H.E. had not shown the requisite prejudice under the statute resulting from P.T.P.'s late report.  *Id.* at 224.

The Maryland Court of Appeals reversed the trial court's application of the statute to the case.  *Id.* at 231.  The court noted the statute made policy provisions requiring notice by the insured to the insurer into covenants rather than conditions precedent.  *Id.* at 227 (citing *House*, 554 A.2d at 406).  The statute accomplished its objective by requiring, first, a specified type of breach by the insured, i.e., lack of cooperation or notice, and, second, a showing by the insurer of actual prejudice resulting from the lack of notice or cooperation.  *Id.*  In concluding the statute did not apply to the case before it, the court adopted the analysis of the dissent in *House*:

> "The fundamental question now is whether, at the time [P.T.P.] reported the [Buckley] claim, there existed a contract between the parties, for one cannot breach a contract which is not in existence.
>
> "To answer this question, [we] look again to the nature of claims made and occurrence policies.  Both types of policies include provisions which define (1) the events for which coverage is provided and (2) when and how coverage can be initiated.  For example, an occurrence policy has a fixed time period defining what specific events or occurrences will be covered.  When this time period ends, however, the insurer's responsibilities under the policy do not end, for it may be held liable for the covered events, barring statutes of limitations, at any time thereafter.
>
> "Claims made policies are almost the mirror image of occurrence policies in that they often cover claims based on events which occurred many years *before* the policy came into effect, but limit the scope of coverage to claims based on these events which are made within the limited time period of the policy.  Unlike the occurrence policy, the insurer's potential liability ends when the policy expires.
>
> "Therefore, when the claims made policy at issue here expired there was nothing left.  The policy could not be breached because there was no longer a policy to be breached.  Any claim made after its expiration is of the same effect as an accident or event which occurs after the 'expiration' of an occurrence policy.  There was no breach; there was simply no coverage.  [We] therefore think that § 482 is inapplicable to a 'reporting' type of claims made policy when the claim is made after the expiration of the policy."

*House*, 554 A.2d at 418 (Murphy, C.J., dissenting) (construing predecessor to current § 19-110), *quoted in T.H.E.*, 628 A.2d at 227-28 (alterations in *T.H.E.* opinion).

The court further noted its opinion was consistent with the weight of authority in other states interpreting notice-prejudice rules because the effect of the contrary argument was "to enlarge the [claims made] policy to embrace claims that it was never intended to cover." *T.H.E.*, 628 A.2d at 228. Thus, applying the principles to the case before it, the court concluded the original policy had expired before a claim was made against P.T.P., and the policy's expiration resulted from the terms of coverage and not from any breach by P.T.P. *Id.* at 230.

It was nearly eighteen years before the Maryland Court of Appeals again had occasion to construe the statute in relation to claims made policies. In *Sherwood Brands*, the trial court had granted summary judgment to the insurer, Great American Insurance Company, for the reason it had acted properly in declining coverage under its third-party liability policy issued to Sherwood. Great American was not required by the trial court to demonstrate prejudice resulting from Sherwood's late notice, which occurred after the 90-day basic extended reporting period following the policy's expiration date. The Maryland Court of Appeals vacated the trial court's judgment and held that the statute applied to the policy. Therefore, the insurer was required to show how it was prejudiced by Sherwood's late notice. 13 A.3d at 1270.

The difference in results of these two cases turned on the policies' different language. In *Sherwood Brands*, the policy obligated Great American to pay all loss that the insureds were obligated to pay as a result of a claim first made against the insureds during the policy period. Further, the policy defined "claim" to mean either a written demand for monetary or nonmonetary relief made against any insured and reported to Great American or a civil, criminal, administrative, or arbitration proceeding made against any insured. Notably, the latter definition of "claim," which was the one applicable to the case, did not also include a requirement that it be

reported to the insurer.  Finally, the policy also contained a "notice of claim" provision that stated written notice by the insureds to the insurer was a condition precedent to the insureds' rights under the policy; for any claim meeting the first definition, notice had to be given prior to the end of the policy period; for any claim meeting the applicable second definition, notice had to be given as soon as practicable but no later than 90 days after the end of the policy period.  *Id.* at 1270-71.

Sherwood is a North Carolina manufacturing corporation with its principal office in Maryland and subsidiaries in other states, including Massachusetts.  Great American had issued to Sherwood a series of annual policies providing liability insurance to the company, its directors, and its officers; the liabilities insured against included employment practices.  The relevant policy term for the case was effective May 1, 2007, to May 1, 2008.  On December 11, 2007, a former employee filed with the Massachusetts Commission Against Discrimination a claim asserting breach of contract, wrongful termination, and many other complaints.  He also filed a related complaint in Massachusetts state court on March 28, 2008, against Sherwood and its subsidiaries, asserting similar theories.  The Maryland Court of Appeals considered it undisputed that both the agency proceeding and the Massachusetts state court proceeding were filed and served on Sherwood during the pendency of the 2007-08 policy.  Sherwood did not notify Great American of the claim until October 27, 2008, a date conceded to be greater than 90 days after the end of the policy period.  *Id.* at 1271-72.  Great American denied coverage for the reason it did not receive notice of the claim until more than 90 days had passed after the expiration of the policy.  *Id.* at 1272.[7]

---

[7]   The case also involved another claim premised upon a court proceeding in Israel against Sherwood *id.* at 1272, but for the sake of simplicity, this Court focuses only on the Massachusetts claim.

*Sherwood Brands* also turned to Chief Judge Murphy's dissent in *House* in explaining the nature of claims made policies:

> So-called "pure" claims made policies generally define "claims made" as all claims brought against the insured within the policy period. The claim made against the insured party is the event which invokes coverage. The policy may also be of a "reporting" type, defining "claims made" as all claims made against the insurer by the insured during the policy period. Thus, the claim made against the insurer is the event invoking coverage in a "reporting" type of claims made policy.

*House*, 554 A.2d at 415 (Murphy, C.J., dissenting), *quoted in Sherwood Brands*, 13 A.3d at 1278. The court then examined the policy issued by Great American to Sherwood. It found the notice requirement relating to a claim precipitated by a civil, criminal, administrative, or arbitration proceeding contained in a separate provision from the definition of such a claim. Thus, the notice requirement for that second definition of claim was not a condition precedent, as Great American had denominated it, but only a covenant that the insured was required to perform. *Id.* at 1287. As a result, the statute applied and it was necessary for Great American to show actual prejudice from Sherwood's breach of the covenant of timely notice. *Id.* The court thus held:

> We hold that § 19-110 does not apply, as was the case in *T.H.E.*, to claims-made policies in which the act triggering coverage—usually notice of a claim or suit being filed against and served upon an insured under third-party liability policies—does not occur until after the expiration of the liability policy, as this non-occurrence of the condition precedent to coverage is not a "breach of the policy," as required by the statute. On the other hand, we hold that § 19-110 does apply, as is the case at present, to claims-made policies in which the act triggering coverage occurs during the policy period, but the insured does not comply strictly with the policy's notice provisions. In the latter situation, § 19-110 mandates that notice provisions be treated as covenants, such that failure to abide by them constitutes a breach of the policy sufficient for the statute to require the disclaiming insurer to prove prejudice.

*Id.* at 1288.

Comparing the policy in the instant case to the policies in these two guiding cases from the Maryland Court of Appeals, the Court concludes the 2006 Policy at issue here is more similar

to the policy in *T.H.E.* than the policy in *Sherwood Brands*.  The 2006 policy defined the insurance coverage for Baylor & Jackson by granting coverage only for claims that were made and reported within the times set forth in the policy, i.e., within the policy period or within the 60-day basic extended reporting period following the expiration date of the policy.  The time for reporting was no mere "notice provision."  Instead, it was incorporated into the definition of coverage and, therefore, became a condition precedent to coverage.  Consequently, Baylor & Jackson's failure to report the claim within the term (or basic extended reporting period) of the 2006 Policy amounted to a failure to perform a condition precedent to coverage.  The policy had expired by the time the claim was reported to MLM, and so, coverage was never triggered under it for the Robbins-Thomas incident.  Thus, no breach of the 2006 Policy occurred and MLM is not required to show actual prejudice in order to disclaim coverage under § 19-110.[8]

## V. Conclusion

MLM is not liable to Defendants for defense or indemnification relating to the Robbins-Thomas incident.  Its motion for summary judgment will be granted.  Defendants' cross-motion for summary judgment will be denied.

DATED this 3rd day of April, 2012.

BY THE COURT:

_____/s/_____
James K. Bredar
United States District Judge

---

[8] Even if MLM were required to show prejudice, it could have easily done so by showing it had been excluded from the post-summary-judgment and appellate proceedings in the *Robbins v. Thomas* case; those were the only opportunities MLM could have had to fashion a request for relief.  Whether it would have been successful with such a request is immaterial to the prejudice flowing from the lack of notice that would have enabled it to participate meaningfully in the litigation.